IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 8, 2013

## STATE OF TENNESSEE v. WILLIAM JAMES WATT

**Appeal from the Criminal Court for Davidson County**
**No. 2011-A-121      Steve Dozier, Judge**

**No. M2012-01487-CCA-R3-CD - Filed January 10, 2014**

A Davidson County jury convicted the Defendant, William James Watt, of three counts of rape of a child and three counts of aggravated sexual battery. The trial court sentenced the Defendant, a Range I, standard offender, to twenty-five years at 100 percent for each of the rape of a child convictions and to ten years at 100 percent for each of the aggravated battery convictions. The court ordered the Defendant to serve some of the sentences consecutively, for a total effective sentence of thirty-five years, at 100 percent. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain two of his convictions for rape of a child and one of his convictions for aggravated sexual battery; (2) the trial court erred when it denied his motion for substitution of counsel and to continue his trial; and (3) his sentence is excessive. After a thorough review of the record and applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROGER A. PAGE, JJ., joined.

J. Michael Engle (at trial) and Emma Rae Tennent (on appeal), Nashville, Tennessee, for the appellant, William James Watt.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from allegations of sexual abuse made by the victim against the Defendant. A Davidson County grand jury indicted the Defendant for three counts of rape of a child and three counts of aggravated sexual battery.

## A. Pretrial Motions

Before trial, the Defendant filed motions to substitute his counsel and to continue his trial. The trial court held a hearing on the motions during which the following evidence was presented: Counsel Scott informed the court that he had filed a motion for substitution of counsel, which was contingent upon the trial court's granting a second motion he filed for a continuance of the trial. The trial court stated that, if the Defendant chose to hire an attorney, the attorney needed to be ready by the date of trial, January 23, 2012. Counsel Scott said that, if the trial court denied the motion for continuance, he would not represent the Defendant because he could not be prepared for trial. The Defendant's court appointed attorney, Counsel Engle, informed the court that he was not yet ready for trial. He said that, when he had learned that the Defendant had retained other counsel, he ceased his trial preparation. Counsel Scott informed the trial court that the Defendant had retained him on December 30, 2011, and that he had filed his motions on January 6, 2012. The trial court expressed concern that neither attorney was prepared for trial. The court noted that the trial had been scheduled since April 2011.

The State informed the trial court that it would suffer prejudice by delaying the trial. It noted that the victim was "a very young child," who was four at the time of the alleged offenses. The State offered an alternate trial date of February 13, 2012. The trial court asked Counsel Scott if he could be ready by the 13th. Counsel Scott stated that he had another trial set for that same date. The trial court then asked Counsel Engle if he could be ready by that date. Counsel Engle testified that he also was scheduled to be in court on that date.

The trial court asked Counsel Scott why the Defendant had waited until such a late date to hire an attorney. Counsel Scott informed the court that the Defendant had approached several local attorneys but was unable to come to a financial agreement with any of them. The Defendant was referred to Counsel Scott by another attorney, and Counsel Scott agreed to represent him, contingent upon the trial being continued.

The State expressed its desire to go forward with Counsel Engle's representing the Defendant, stating its belief that the Defendant was hiring Counsel Scott to delay the trial. The trial court ordered that the trial remain scheduled for January 23, 2012, with Counsel Engle representing the Defendant.

## B. Trial

At the Defendant's trial, the following evidence was presented: Kelly Large, the victim's mother, testified that the victim was six years old at the time of trial. She said that her mother married the Defendant, whom she called "Papa," on October 14, 1995. Mrs. Large met the Defendant the day of the wedding. She was aware, however, that the Defendant had previously been married to her mother once before. The Defendant was her mother's first husband. Her mother's second husband was Mrs. Large's father.

Mrs. Large recalled that, shortly after her mother married the Defendant for the second time, Mrs. Large was living in Virginia with her husband and two children, ages five and two. The Defendant, who was living with Mrs. Large's mother in Tennessee, began visiting her frequently. She explained that the Defendant's family owned a farm in Virginia and, when his brother became ill, the Defendant made trips to Virginia to help his brother on the farm. He would stay with his brother during the week and then stay with Mrs. Large and her family on weekends. During this time, she began to think of the Defendant as a member of her family.

Mrs. Large said that, around August 2007, she and her husband moved to Massachusetts for three years, and then they moved to Nashville in August 2010, in part to be closer to Mrs. Large's mother and the Defendant. After the move, Mrs. Large left her three children with her mother and the Defendant approximately once per week. Sometimes, she left the children with only the Defendant when her mother was not present. Mrs. Large said she and her family often ate dinner with her mother and the Defendant in addition to the times when her children were in their care. She described her relationship with her mother as close. Mrs. Large said she trusted the Defendant to care for her children, including her youngest child, J.L.[1]

Mrs. Large recalled that J.L., who was four years old, recounted events to Mrs. Large that led to the charges in this case. Mrs. Large remembered the events surrounding J.L.'s disclosure, stating that it was fall and they had been to a baseball game for one of her other children. The Defendant was also in attendance to cheer on the team. After the game, the Defendant went to Mrs. Large's house to install some laundry room shelving. Later, Mrs. Large gave J.L. a bath, and, when she got her out of the bathtub and was drying her, J.L. said "Mommy, what if Papa tickled my tootie."[2] Mrs. Large stated that the Defendant was in the next room, so she closed the doors and sat down and tried to ask J.L. open-ended questions to determine what had happened. Upon questioning, J.L., who appeared "scared," described for her mother what had happened.

---

[1] In order to protect her privacy, and in keeping with the policy of this Court, we will refer to the victim by her initials.

[2] Large testified that "tootie" was the term that J.L. used for the "parts around her vagina."

Mrs. Large said that she then obtained a tape recorder to tape record J.L. She felt that it was important to record the allegations in J.L.'s own voice. On the recording, J.L. stated that the Defendant "tickled her tootie." J.L. explained that she and the Defendant were in the bed and covers were on top of their heads. She said that he took his pants off and that she took her pants off. She said that she tickled him and that he tickled her. J.L. said that the Defendant told her that she would never see him again if she told anyone.

Mrs. Large said she asked her son to come into the room, and she asked him if he knew anything about this. He said he did not. She then got her husband and informed him what J.L. had said. Her husband was very angry and upset and wanted to confront the Defendant immediately. Mrs. Large implored her husband not to do so, wanting to discuss the allegations with her mother first. Mrs. Large said she asked her husband to watch their children and left for her mother's house. On the way, she called her pastor, who advised her not to go to her mother's house, to call the police, and to come to meet with him and the other elders the following day, which was a Sunday. Mrs. Large returned home and spoke with her husband at length. The two then called the Sumner County Police Department.

When the police arrived, Mrs. Large and her husband gave them a statement. After speaking with a Sumner County detective, Mrs. Large learned that she needed to contact a detective in Davidson County where the offense allegedly occurred. Accordingly, the following day, she contacted the Davidson County police. Mrs. Large said that, in addition, J.L. participated in a forensic interview and a medical examination. A social worker also interviewed Mrs. Large's two older sons.

Mrs. Large testified that Detective Chuck Fleming, the Davidson County detective assigned to the case, asked her to participate in a controlled telephone call with the Defendant. Mrs. Large agreed and called the Defendant, but he did not answer so she left a message. When the Defendant returned her call, the two had a conversation that lasted approximately two hours. Mrs. Large said that the Defendant initially denied that he had done anything wrong. During the course of the conversation, however, he "confess[ed]." Mrs. Large wrote her husband a note during the conversation, asking him to contact her mother, who was not at home with the Defendant, and tell her mother to come to the Large's house immediately. Mrs. Large said her mother arrived, and she discussed with her mother the telephone conversation. Her mother, she said, was "devastated."

The recording of the conversation, which was introduced later in the trial through a different witness, confirmed that the Defendant initially denied that he had ever inappropriately touched J.L. He said there was "no way" he molested J.L. He then said a couple of times when he was urinating, J.L. opened the door to the bathroom. He said that, when she saw him urinating, she said "I don't have one of those," pulled down her pants, and said, "Mine looks like this." Mrs. Large said that J.L. said that the Defendant's "tootie" was "long and stretchy." The Defendant said the only way that she saw this was when she pulled

down his underwear while he was shaving. The Defendant said that he admonished J.L. for entering the restroom and told her not to do it again.

Mrs. Large told the Defendant that J.L. had said that the Defendant made her kiss his "tootie." The Defendant responded that it would be only natural for Mrs. Large to believe J.L., that she should believe J.L., and that he loved them. Mrs. Large reminded the Defendant that J.L. was only four years old and that no one told her to say these things. Mrs. Large said that J.L. told her that one of the incidents occurred while Mr. and Mrs. Large were at the doctor's office. Mrs. Large informed the Defendant that this would have been the previous Friday when he was alone with J.L.

The Defendant then said that, one time when he was lying on the bed with J.L., J.L. told him that she liked to have her "tootie" tickled. The Defendant asked what a "tootie" was, and J.L. reached down and touched herself and said that was her "tootie." The Defendant said that he told her "no." The Defendant said he told her that "boys and girls don't touch each other like that." He said that he got up and went to watch television with J.L.'s brother. Mrs. Large then asked the Defendant why he had never told anyone about that incident. The Defendant denied that he ever touched J.L.

After much conversation, the Defendant paused and then said, "You can go ahead and shoot me, I touched her once. And, yes, it was under the covers." The Defendant, who sounded upset, repeatedly said, "I don't know why." He then said it would never happen again. Mrs. Large thanked the Defendant for being honest. She then asked how long ago it happened. The Defendant said that what J.L. said was true, that it happened the previous Friday when Mr. and Mrs. Large went to the doctor.

Mrs. Large asked the Defendant why he did that, and the Defendant said he did not know. The Defendant said that he just touched J.L. with two fingers to tickle her "at the very top" of J.L.'s vagina. The Defendant said that the best thing for him to do was to disappear. The Defendant said, "If there is any way you can keep me out of jail, I would appreciate it. I would do just about anything."

Mrs. Large asked if there had been any more times. The Defendant responded "no." The Defendant said he made an "improper pass" and that he was "the one that did it." Mrs. Large said that what he did was "child molestation," and the Defendant responded, "okay." The Defendant said that he only told Mrs. Large the truth because of his feelings for her and her family. He said that, "as soon as he did it he knew it was wrong." He said again it was only two fingers, and it was a tickle. He said that there was no insertion "what so ever," but he agreed it was still "molesting." The Defendant asked that they keep it between them.

In response to a question from Mrs. Large, the Defendant said that you reach a certain age and "things don't work," seemingly indicating that he was unable to obtain an erection.

Mrs. Large asked him why then was he interested in J.L. He said he was not interested in her but that she kept asking him to tickle her there because she liked to be touched there, and he, "unfortunately," gave in. The Defendant denied that he ever touched her inappropriately on any other occasion.

The Defendant agreed that he was not okay with what he had done. The Defendant said he had one more thing he wanted to tell Mrs. Large. He then said that he had, in fact, told J.L. not to tell anyone because he realized what he had done. The Defendant said that he "just committed [him]self to hell."

During cross-examination, Mrs. Large agreed that the conversation she recorded with J.L. was not the first conversation that the two had about the allegations. They had spoken earlier in the bathroom, and Mrs. Large did not record that conversation. Mrs. Large agreed that, during her conversation with the Defendant, she stated that she had been through this before because her own father had done this to her. She said that law enforcement was never notified of the abuse that she had suffered.

During redirect examination, Mrs. Large testified that she gave law enforcement officers the tape recording of her conversation with the Defendant and that they had the tape at the beginning of their investigation.

J.L. testified that she was six years old at the time of trial. She said that she lived with her mother, father, and two brothers, and that she was in kindergarten. J.L. said that she understood that she was at trial to discuss that "Papa tickled my tootie," and she identified the Defendant as her Papa. J.L. said that the Defendant had touched her "tootie" on three occasions, once in the attic of his home, once in his bathroom, and once in her "Nana's room."

J.L. described the attic incident, saying that she tickled the Defendant's "tootie" that day and "that day didn't really feel right." She said that she tickled him with her hands and a "flower." J.L. recalled that she was touching his skin at the time. J.L. said that, at that same time, the Defendant also touched her "tootie" on her skin with his hands and a flower. She said she "th[ought]" he tickled her on both the inside and the outside. J.L. said the Defendant told her not to tell anyone or he would get into trouble. J.L. said that, later that day, she told her mother about the tickling.

J.L. described the event that occurred in her Nana's room, saying that she and the Defendant touched each other while they were under the covers. She said again that he touched her with his hands and a flower and that his hands were moving while he was touching her. J.L. said that she tickled the Defendant's "tootie" because he asked her to do so. She said that he told her not to tell anyone or he would get into trouble. J.L. then testified that this occurred in her Nana's room "[m]ore than one time."

J.L. then described the event in the Defendant's bathroom, saying that the Defendant tickled her "tootie" on her skin. She said that she also tickled his "tootie" and that her hands were moving while she was touching him.

J.L. said that the Defendant also touched her in this manner while she was outside. She said that the Defendant was wearing one of her Nana's bathing suits. She agreed that he asked her to pull down his bathing suit. J.L. then said she did not want to talk about this incident.

Jane Watt, the Defendant's wife and J.L.'s grandmother, testified that she and the Defendant were happily married and enjoying life before these allegations. They had a good relationship with Mrs. Large's family, and they saw them a great deal once the Larges moved to Nashville. Mrs. Watt testified that she and the Defendant sometimes babysat her grandchildren. She was director of the church choir and was also involved in theater work, which took her away from the house in the evenings. The Defendant was retired and sometimes babysat the children alone. There were times when the Defendant babysat J.L. only, and her brothers were not present.

Mrs. Watt testified that it appeared that J.L. and the Defendant enjoyed spending time together. She said there were only two instances that she can recall that their interactions seemed inappropriate. The first was when the Defendant and J.L. were in the den together. The Defendant had J.L.'s legs on his chest area while his shirt was open. J.L.'s legs were bare. Mrs. Watt said she asked the Defendant what was going on, and he said that he was just tickling J.L.'s legs. Mrs. Watt said that, while she found this unusual, she trusted the Defendant, who had been her husband for twelve years at that point. She dismissed the event.

Mrs. Watt said that, another time after that incident, she came home and found the Defendant and J.L. on the bed in her bedroom. She again asked what was going on, and the Defendant jumped up and followed her into the kitchen. He again had his shirt open, and she asked him why it was open. He said that it was hot, and Mrs. Watt told him it was "not that hot." Mrs. Watt said she again had the thought occur to her that this might be inappropriate, but she said she could not "ever fathom that he would do that."

Mrs. Watt said she recalled a time when J.L. was in the attic with the Defendant. They had gone to the attic with J.L.'s two brothers, but J.L. stayed up there. Mrs. Watt said she did not think anything of the Defendant and J.L.'s being alone in the attic together.

Mrs. Watt said that the Defendant, during their marriage, could achieve an erection and that he shaved his pubic hair. The Defendant always wore a speedo as a bathing suit.

Mrs. Watt said that after she went to the Larges' home, where she was informed of

the allegations, she did not doubt them. She stayed at the Larges' home for two hours and then called a friend to accompany her home. She asked the friend to wait in the computer room while she confronted the Defendant. Mrs. Watt said the Defendant asked her what was wrong, and she told him that she had been to the Larges' home. He asked her if she wanted to shoot him now or later. Mrs. Watt told him that if she had a gun she probably already would have. The Defendant said, "[I]f I had a gun I probably already would have." She told him it would have "been a God's blessing if you had."

Mrs. Watt said that she told the Defendant to leave the house, but he did not want to leave. The two discussed the situation further, and the Defendant said he was hoping that they could keep it within the family. Mrs. Watt told him that the Larges had already called the police, and the Defendant "just about exploded." Mrs. Watt said that, throughout their conversation, the Defendant never denied the allegations. His main concern seemed to be about what was going to happen to him.

Mrs. Watt said that the Defendant stayed at the home over the next several days and slept in another room. During this time, Mrs. Watt and Mrs. Large went to their church to meet with a pastor. Mrs. Watt explained that the Defendant was a trustee at the church and was a very trusted man. She felt, therefore, that she needed to inform the church of the allegations.

Mrs. Watt said that the Defendant spoke with a detective at their home. After so doing, he came to her and informed her that he had been assaulted when he was a child. He told her that he needed help. Mrs. Watt made an appointment for him to talk to a pastor. After speaking with the pastor, the Defendant called her, crying, and told her that he needed help and to please call a doctor for him. She took the Defendant to a treatment facility, Tennessee Christian Hospital, where he checked himself in.

Mrs. Watt said that, since then, she had not spoken with the Defendant frequently. When the two communicated, either on the phone or by mail, the Defendant never denied the allegations or suggested the allegations were exaggerated. Mrs. Watt testified that she had since filed for divorce from the Defendant.

Detective Chuck Flemming testified that he is assigned to the sex crimes unit, and he was assigned to this case. He explained that he was contacted by the Hendersonville Police Department, who informed him that they had responded to the Larges' home and created a police report. During the interview for their report, they discovered that the allegations had taken place in Davidson County, so they notified Davidson County authorities and turned over to them the information they had gathered.

Detective Flemming testified that he spoke with Mrs. Large as part of his investigation, having contacted her within 24 hours of being assigned the case. The detective

learned that Mrs. Large had recorded a portion of J.L.'s initial disclosure to her about the abuse. He described Mrs. Large on the recording as "[v]ery calm" and asking open-ended questions. Detective Flemming said that, based upon this, he felt comfortable using some of the information he received from the tape.

Detective Flemming said that he asked Mrs. Large to call the Defendant and create an audio recording of the conversation. Mrs. Large was successful in recording a long conversation between the Defendant and herself, and she gave that recording to Detective Flemming. Detective Flemming testified that, after listening to the recording, he contacted the Defendant, who seemed interested in speaking with the detective. During their conversation, Detective Flemming found the Defendant "[c]alm, reflective, religious to a point." An audiotape of the detective's interview with the Defendant was then played for the jury.

During the Defendant's interview with Detective Flemming, the following occurred: The Defendant told the detective that he was seventy-one years old, had a clean record, and had been given a Top Secret Step 2 security clearance in the Army. The Defendant said that he and Mrs. Watt were first married on November 6, 1965. They separated in February of 1969, and remarried October 26, 1996. The Defendant said he had been married to two different women and had never "stepped out of line" despite his having the opportunity.

The detective asked the Defendant to tell him what happened with J.L. The Defendant told the detective that the Large family had been living in Massachusetts, and he and Mrs. Watt saw them once a year, if that. The Larges lost their house, and he and Mrs. Watt "begged" them to come to Tennessee. The Defendant said that they moved down, and that "this has only happened within the last month and a half."

Detective Flemming asked the Defendant "[w]hat was the first time?" The Defendant said that it was not J.L.'s fault but that on three occasions J.L. entered the bathroom while he was in it with the door closed. On two of those occasions, J.L. saw him urinating. J.L. said "I don't have one of them," indicating toward his penis. She then pulled down her pants and said "I got this." On a third occasion, the Defendant was shaving and J.L. entered the room and pulled his "britches" down. On a fourth occasion, J.L. attempted to enter the bathroom but was stopped by Mrs. Watt. The Defendant said he never touched J.L. on these occasions.

The detective asked the Defendant, "When did you touch her?" The Defendant responded that he and J.L. were watching cartoons. She wanted her back and tummy tickled. "And then she wanted – she calls it her 'tootie.'" The Defendant said that at no time did he "do any insertion with [his] finger or anything else. That – that never happened." J.L. asked him to tickle her tootie, and the Defendant said he did not know what that was. He asked J.L. what her tootie was, and J.L. pulled down her panties and said, "That." The Defendant asked

J.L. why she wanted him to touch that, and she responded "Because it feels good when it's touched." The Defendant said that he had "[n]ever touched her until then." Detective Flemming asked the Defendant how long he "tickled" her, and the Defendant responded, "Maybe half a minute." When he stopped, J.L. asked him to do it some more, but the Defendant refused.

The Defendant described to the detective another incident that occurred in his bedroom. He said that J.L. liked to play "tent." He was in shorts and no underwear. The Defendant said that J.L. pulled his shorts down, and he "let her pull them down." The Defendant said that J.L.'s lips touched his penis on two occasions. He said they touched the side of his penis and only for a second. The Defendant said that, on that occasions, he also tickled and "rub[bed]" her tootie for "maybe a total of four minutes." The Defendant clarified that he was touching the top part of J.L.'s vaginal area where he believed the clitoris was located. The Defendant agreed he made a "very" big mistake.

The Defendant told Detective Flemming that, when Mrs. Large called him, at first he denied "it." He later decided he could not do that, and he told her, "Yes, I did." The detective asked the Defendant what he had told Mrs. Large, and the Defendant told him "just what I told you, except that I didn't tell her about the touching of her lips to my penis. I didn't tell her that . . . I couldn't tell her that."

The Defendant said that J.L. asked him to put his penis inside her, and he told her no. The detective asked him if his penis ever touched any part of her body besides her lip, and the Defendant said "she rolled over against it," and his penis touched her leg. He did not recall whether it was the inside or the outside of her leg. The Defendant said that his penis was not erect at the time of this contact because he was no longer able to obtain an erection.

The Defendant expressed remorse that he had "ruined so many lives." He expressed his desire to get some help.

During cross-examination, the detective agreed that J.L. first reported the alleged abuse on September 26, 2010, and that she was not interviewed by the forensic interviewer until September 30, 2010. J.L.'s interview occurred after Detective Flemming had already spoken with Mr. and Mrs. Large independently. Detective Flemming agreed he was not present when Mrs. Large made the controlled call with the Defendant, but he reiterated that he had listened to the recording of that conversation.

Sue Ross, a pediatric nurse practitioner working at Our Kids Center, testified as an expert that she conducts medical evaluations on children who have alleged that they have been sexually abused. Ms. Ross said that she did not conduct J.L.'s exam, but it was conducted by another nurse practitioner who had recently left Our Kids for another job. Ms. Ross testified that she had reviewed the findings of the exam, which indicated that there were

no physical findings or trauma.

Ms. Ross testified that semen is typically only found on children of a young age within eight hours of the assault. Further, in children of this age, any chance of recovery of any kind of seminal fluid is reduced if the child had a bath.

The State made its election of offenses, as follows:

Count 1, rape of a child alleges an act of genital penetration against [J.L.], date of birth 11/3/2005, and refers to the victim's testimony and the defendant's admissions that he, quote, tickled her tootie, close quote, on the inside with his hand in her Nana's room on the bed while they were playing tent.

Count 2, rape of a child alleges an act of genital penetration against [J.L.], date of birth, 11/3/2005, and refers to the [D]efendant's admissions that he, quote, rubbed her clitoris, close quote, indeed [sic] TV room while they were watching the Sprite channel.

Count 3, rape of a child alleges an act of fellatio against [J.L.], date of birth, 11/3/2005, and refers to the victim's testimony and the [D]efendant's admissions that she put her mouth on his penis.

Count 4, aggravated sexual battery alleges and act of sexual contact against [J.L.] . . . . and refers to the victim's testimony that the [D]efendant, quote, tickled her tootie, close quote, on the skin with a flower.

Count 5, aggravated sexual battery alleges and act of sexual contact against [J.L.] . . . and refers to the victim's testimony that the [D]efendant, quote, tickled her tootie, close quote, on the skin with his hand in the attic but she could not remember if he, quote, tickled her tootie, close quote, on the inside or the outside or both.

Count 6, aggravated sexual battery alleges an act of sexual contact against [J.L.] . . . and refers to the victim's testimony that she touched the [D]efendant's, quote, tootie, close quote, with her hand on the skin in the bathroom and her hand moved.

The Defendant testified that the statements that he had made in the recorded conversations were truthful. The Defendant explained the attic incident, stating that they were moving plastic bins to the attic and that all three Large children were helping. J.L. and one of her brothers were playing in the attic. He said that nothing inappropriate happened that day.

The Defendant testified about the incident in the TV room, saying that he and J.L. were watching television. It was hot, their house lacked adequate air conditioning, and he had his shirt unbuttoned. J.L., who was wearing a short skirt and a top, wanted to be tickled. The Defendant testified that he tickled J.L. and that he did not "rub" her. The Defendant said he tickled her "above" where her clitoris would be located. He denied that his finger ever went inside J.L.

The Defendant testified about the "tent" incident that occurred on his bed. He said that J.L. asked to play "tent" and told him that he was going to have a surprise part. The Defendant said that he, at J.L.'s request, used his legs to prop up the sheet. When he did so, unbeknownst to him, his shorts slid down. He said he "did not know that until all of the sudden I felt her lip touch the rim [of his penis]." He said that J.L. yelled, "[S]urprise." The Defendant said he immediately jumped up and told J.L. never to do that again.

The Defendant said that he was distressed by J.L.'s allegations and that he sought psychiatric treatment for this distress. It took the hospital twelve days to get him "stabilized."

During cross-examination, the Defendant testified that he did not do anything wrong. The Defendant said that at no time did he have any sexual desire to touch J.L. He explained that he sought counsel from his pastor and checked himself into a hospital because, after J.L.'s allegations, he realized that his actions "could be construed as inappropriate." The Defendant agreed that he told Mrs. Large that he knew what he had done was wrong, that he felt bad about it, and that he was going to go to hell. He reiterated that he only said this because he knew that what he had done could be construed as wrong.

The Defendant said that each time J.L. touched his penis, he was unaware she was going to do so. He said that he did not know she was going to put her mouth on his penis until she did it. The Defendant agreed that he had not told the detective about his being unaware that J.L. was going to put her mouth on his penis.

Based upon this evidence, the jury convicted the Defendant of three counts of rape of a child and three counts of aggravated sexual battery.

## C. Sentencing

At the Defendant's sentencing hearing, Mrs. Large spoke and expressed anger toward the Defendant, in part because he confessed on multiple occasions and then, at trial, denied wrongdoing. Further, she said he blamed J.L. for his actions, and J.L. was only four at the time he molested her. Mrs. Large said that Defendant had also removed money from his joint account with her mother and had not paid for his share of their marital obligations. Mrs. Large said that J.L. and both of Mrs. Large's sons had been negatively impacted by the Defendant's actions. She asked that the court sentence the Defendant as it "saw fit."

The Defendant presented evidence that he suffered from medical conditions. He had been prescribed Seroquel XR, which is indicated for use by "elderly patients with demented related psychoses." The Defendant's counsel also offered the Defendant's medical records from his admission to a psychiatric facility. The Defendant's counsel also offered letters from several people describing the Defendant's charitable work.

William Flum testified that he had known the Defendant for between fifteen and twenty years. Mr. Flum said the Defendant lived with him after the accusations surfaced until he was incarcerated. Mr. Flum said he found a box of documents related to the Defendant, and he brought those with him to court. They included the Defendant's diploma, military reviews and other documents from his miliary service, and documents referencing his volunteer work. Mr. Flum said that the Defendant had a good reputation in the community and that more than fifty people had called Mr. Flum to express their support of the Defendant.

Based upon this evidence, the trial court found that one enhancing factor and one mitigating factor were applicable. In enhancement, the trial court found that the Defendant abused a position of private trust because he was the stepparent of the victim's mother and acted as a grandfather to the victim. While affording it little weight, the trial court found that the Defendant's advanced age and medical conditions did constitute a mitigating factor.

The parties agreed that the Defendant should be sentenced to twenty-five years for each of the three rape of a child convictions. The trial court then imposed a sentence of ten years for each of the three aggravated sexual battery convictions. The trial court then imposed consecutive sentences based upon Tennessee Code Annotated section 40-35-115(b)(5), stating:

> In this case, the Court finds that consecutive sentences should be imposed because this case involves multiple acts of sexual abuse including digital penetration and oral sex of the victim upon the [D]efendant and various acts of sexual battery. The victim's mother indicated the victim is in counseling about the offenses. Based upon these findings, the Court finds counts one and four shall be served consecutively for an effective thirty-five year sentence. By statute, each count is to be served at 100%.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain two of his convictions for rape of a child and one of his convictions for aggravated sexual battery; (2) the trial court erred when it denied his motion for substitution of counsel and to continue his trial; and (3) his sentence is excessive.

## A. Sufficiency of Evidence

The Defendant contends that the evidence presented at trial is insufficient to sustain three of his convictions, as detailed below. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523

(Tenn. 1963)).  This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence.  *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1.  Count 1 - Rape of a Child

In Count 1, rape of a child, the State elected the following facts:

Count 1, rape of a child alleges an act of genital penetration against [J.L.], date of birth 11/3/2005, and refers to the victim's testimony and the defendant's admissions that he, quote, tickled her tootie, close quote, on the inside with his hand in her Nana's room on the bed while they were playing tent.

The Defendant asserts that the State failed to present sufficient evidence that he sexually penetrated J.L. as defined by the statute.  The State counters that both the victim's testimony and the Defendant's admissions support that he sexually penetrated the victim.

A conviction for rape of a child requires "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than (3) years of age but less than thirteen (13) years of age."  T.C.A. § 39-13-522(a) (2010).  Tennessee Code Annotated section 39-13-501(6) and (7) defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." and sexual contact as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . ."  There is sexual penetration, in a legal sense, if there is the "slightest penetration" of a female's sexual organ.  *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001).  This includes the "outer folds" of the vagina.  *Id.*

The victim testified that the Defendant "tickled her tootie" on this occasion.  She said she thought he touched her on the inside and the outside, and she indicated on a drawing that he touched the area in which her clitoris would be located.  The Defendant told Mrs. Large that he touched J.L. with two fingers to tickle her "at the very top" of J.L.'s vagina when the two were in his bedroom under the covers.  He told Detective Flemming that, on the occasion in his bed, he also tickled and "rub[bed]" J.L.'s "tootie" for "maybe a total of four minutes."  The Defendant clarified that he was touching the top part of J.L.'s vaginal area where he believed the clitoris was located.  Ms. Ross testified about the anatomy of a prepubescent girl, stating that the clitoris is located under the clitoral hood.  This evidence is sufficient for

a jury to conclude that the Defendant sexually penetrated the victim, as legally defined, by rubbing or touching her clitoris. The Defendant is not entitled to relief on this issue.

## 2. Count 2 - Rape of a Child

The State alleged in Count 2 the following:

Count 2, rape of a child alleges an act of genital penetration against [J.L.], date of birth, 11/3/2005, and refers to the [D]efendant's admissions that he, quote, rubbed her clitoris, close quote, indeed [sic] TV room while they were watching the Sprite channel.

The Defendant asserts the evidence is insufficient to sustain this conviction because the evidence was based upon the Defendant's admission. He asserts, however, that he never used the words "rubbed" or "clitoris." The Defendant said that, even if he had used those words, "such proof would not establish the offense of rape of a child." The State asserts that the proof presented at trial contradicts the Defendant's assertions.

About this event, the Defendant's wife, Mrs. Watt, testified that she saw the Defendant and J.L. in the television room watching cartoons and that the Defendant had J.L.'s legs on his chest area while his shirt was open. J.L.'s legs were bare. Mrs. Watt said she asked the Defendant what was going on, and he said that he was just tickling J.L.'s legs. The Defendant told Detective Flemming that the first incident of his touching J.L. occurred while the two were watching cartoons. He said that J.L. wanted her back and tummy tickled. "And then she wanted – she calls it her 'tootie.'" The Defendant said that at no time did he "do any insertion with [his] finger or anything else. That – that never happened." J.L. asked him to tickle her tootie, and the Defendant said he did not know what that was. He asked J.L. what her tootie was, and J.L. pulled down her panties and said, "That." The Defendant asked J.L. why she wanted him to touch that, and she responded, "Because it feels good when it's touched." The Defendant described the touching as "tickling and then a rub." The detective asked if this was "on her vaginal area," and the Defendant responded, "[A]t the upper. Like I told you." Later during their conversation, the Defendant described the other incident of touching J.L. as touching the top part of her vaginal area where he believed the clitoris was located. The Defendant said the first incident of touching lasted approximately half a minute.

We conclude that this evidence is sufficient to support a verdict based upon facts elected by the State. In the context of the conversation, the Defendant was clearly discussing touching the top of the victim's vaginal area where her clitoris was located. He described the touching as a "tickling and then a rub," and he stated that this touching occurred while the two were watching cartoons together. The evidence supports the verdict, and the Defendant is not entitled to relief on this issue.

### 3. Count 4 - Aggravated Sexual Battery

In Count 4, the State alleged the following facts:

> Count 4, aggravated sexual battery alleges an act of sexual contact against [J.L.] . . . . and refers to the victim's testimony that the [D]efendant, quote, tickled her tootie, close quote, on the skin with a flower.

The Defendant alleges that the evidence is insufficient to support this conviction because the victim alleged that the Defendant "tickled her tootie" with a flower on two occasions, once in the attic and once in her grandmother's bedroom. As such, the Defendant argues that the State's election was insufficient to ensure juror unanimity. The Defendant presents this argument for the first time on appeal. Below, he contended that the evidence was insufficient to sustain this conviction because the touching did not constitute "sexual contact" for the purpose of sexual arousal or gratification. The trial court, therefore, never had the opportunity to address this contention.

The State counters that Count 5 clearly addresses the attic incident, as the State detailed in its election, and the jury would have understood, therefore, that Count 4 addressed the incident in the bedroom.

The jury convicted the Defendant of aggravated sexual battery. This requires proof beyond a reasonable doubt that: (1) the Defendant had "unlawful sexual contact," which the Code defines as the intentional touching of intimate parts with the purpose of sexual arousal or gratification, with the victim; and (2) that the victim be less than thirteen years of age. T.C.A. §§ 39-13-501(6), -504(a)(1)-(4) (2009).

The doctrine of election of offenses requires that when there is evidence at trial that a defendant has committed multiple offenses against a victim, the State must elect the facts upon which it is relying to establish each charged offense. *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). Thus, when the State presents evidence showing that more than one offense occurred, but the indictment is not specific as to which offense the defendant is being tried for, it is the responsibility of the trial court to require the State to elect which offense is being submitted to the jury. *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999); *see also State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991) ("[I]n cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts.").

The requirement of election serves several purposes: (1) it enables the defendant to

prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. *Brown*, 992 S.W.2d at 391.

In this case, the victim did, in fact, testify about two incidents involving the Defendant's touching her with a flower. One of those incidents occurred in the attic, and one of those incidents occurred in the victim's "Nana's" bedroom. The State elected the following facts with regard to Counts 4 and 5:

> Count 4, aggravated sexual battery alleges and act of sexual contact against [J.L.] . . . . and refers to the victim's testimony that the [D]efendant, quote, tickled her tootie, close quote, on the skin with a flower.

> Count 5, aggravated sexual battery alleges and act of sexual contact against [J.L.] . . . and refers to the victim's testimony that the [D]efendant, quote, tickled her tootie, close quote, on the skin with his hand in the attic but she could not remember if he, quote, tickled her tootie, close quote, on the inside or the outside or both.

We agree with the Defendant that the trial court should have required the State to elect facts more specific about which touching with the flower incident is referred to in Count 4. We find unpersuasive the State's argument that, because Count 5 referred to the attic incident, Count 4 clearly addressed the flower touching in the bedroom.

This Court has previously determined that a trial court's failure to properly instruct the jury about the State's election may be harmless "where the prosecutor provides during closing argument an effective substitute for the missing instruction." *State v. Adrain Keith Washington*, No. M2008-01870-CCA-R3-CD, 2010 WL 653008, at *6 (Tenn. Crim. App., at Nashville, Feb. 24, 2010) (quoting *State v. William Darryn Busby*, No. M2004-00925-CCA-R3-CD, 2005 WL 711904, at *6 (Tenn. Crim. App., at Nashville, Mar. 29, 2005); citing *State v. James Arthur Kimbrell*, No. M2000-02925-CCA-R3-CD, 2003 WL 1877094, at *23 (Tenn. Crim. App., at Nashville, Apr. 15, 2003)); *State v. Michael J. McCann*, No. M2000-2990-CCA-R3-CD, 2001 WL 1246383, at *5 (Tenn. Crim. App., at Nashville, Oct. 17, 2001), *perm. app. denied* (Tenn. Apr. 1, 2002); *State v. William Dearry*, No. 03C01-9612-CC-00462, 1998 WL 47946, at *13 (Tenn. Crim. App., at Knoxville, Feb. 6, 1998), *perm. app. denied* (Tenn. Jan. 19, 1999)), *perm. app. denied* (Tenn. Aug. 26, 2010).

In this case during closing arguments, the prosecutor stated:

> But we have her giving us four events, [three] separate events of sexual

contact [with regard to the aggravated sexual battery charges]. The tickling with the flower, and again, pulled that one out because it was different. She talked about he tickled her tootie in the attic, but she couldn't remember if it was on the inside or the outside. She knew it was on her tootie, that offense was elected as an aggravated sexual battery offense for that reason, she couldn't remember if it was inside.

And then she also talked about, with count six of the indictment, she talked about tickling his tootie in the bathroom. So those are the three counts of aggravated sexual battery, and that's the nature of the sexual contact that supports each of those counts.

We conclude that this description of the three counts of aggravated sexual battery ensured that the jury reached a unanimous verdict with respect to Count 4. Count 4, the prosecutor noted, referred to the touching of the victim with the flower. The prosecutor noted that the attic incident related to the touching in the attic, which the victim could not recall whether was "inside" or "outside." Under these circumstances, we conclude that any error in the election instruction was rendered harmless by the prosecutor's statement with regard to the offenses during her closing argument. The Defendant is not entitled to relief on this issue.

### B. Motion for Substitution of Counsel

The Defendant next contends that the trial court erred when it denied his motion for substitution of counsel and to continue his trial. He asserts that the trial court denied his motion based upon its "unfounded conclusion that the [D]efendant made the request in bad faith to delay the trial." In fact, he asserts, he had made several attempts to retain counsel but was unable to reach a financial arrangement with a lawyer until three weeks before trial. The State counters the Defendant has failed to show that the trial court abused its discretion when it denied the Defendant's motion, which was filed only seventeen days before the Defendant's trial date that had been set since April 2011.

The decision to grant a motion for a continuance is left to the trial court's discretion, and a denial of the requested continuance will not be overturned on appeal absent a clear showing of an abuse of that discretion. *State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999) (citing *State v. Melson*, 638 S.W.2d 342, 359 (Tenn. 1982); *Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973)). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *State v. Thomas*, 158 S.W.3d 361, 392 (Tenn. 2005). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *Id.* (citing *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995)).

The right to counsel is grounded in the constitution. It is a fundamental constitutional principle that a person is entitled to a fair trial. U.S. Const. amend. XIV, § 1 (providing that no State shall "deprive any person of life, liberty, or property, without due process of law"). To protect this right, a person who is accused of a crime is entitled to representation by counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). This right is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963); *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984); *see* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); Tenn. Const. art. I, § 9 ("[I]n all criminal prosecutions, the accused hath the right to be heard by himself and his counsel.").

The United States Supreme Court has further observed, however, that "'while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.'" *State v. White*, 114 S.W.3d 469, 475-76 (Tenn. 2003) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988); *State v. Huskey*, 82 S.W.3d 297, 305 (Tenn. Crim. App. 2002)). Thus, under both the Sixth Amendment and article I, section 9, the right to the counsel of one's choosing "must be balanced against the requirements of the fair and proper administration of justice." *Id.* (citing *Huskey*, 82 S.W.3d at 305 and *United States v. Micke*, 859 F.2d 473, 480 (7th Cir. 1988)).

In the case under submission, we conclude that the Defendant failed to prove that the trial court abused its discretion when it denied his motion for continuance. In April 2011, the parties scheduled the Defendant's trial for January 23, 2012. The Defendant retained Counsel Scott on December 30, 2011. On January 6, 2012, just seventeen days before trial, Counsel Scott filed a motion to substitute himself as counsel and to continue the case. The trial court inquired about available dates for both Counsel Scott and the Defendant's appointed counsel, Counsel Engle. Counsel Engle said he could be ready to proceed with trial on January 23, 2012. Counsel Scott said he would be unable to be ready on that date. The parties could not find a date in the months after the scheduled trial date upon which they could all be available. After much discussion and the parties' inability to all be available, the trial court denied the motions for the substitution of counsel and for a continuance. We conclude that the Defendant was provided counsel at his trial. The counsel of his choosing was unable to be ready on his trial date and was unavailable on the other dates offered by the trial court. The Defendant has failed to prove that the trial court abused its discretion by showing that the outcome of his trial would have been different had the trial court granted the motion to continue. He is not entitled to relief on this issue.

**C. Sentencing**

The Defendant next contends that his sentence is excessive. He asserts that the trial court erred when it applied enhancement factor (14), that he abused a position of trust. He further contends that the trial court erred when it ordered partial consecutive sentencing. He asserts that the nature and scope of his sexual acts were not particularly aggravated, there were only two alleged acts, and the victim has not suffered residual mental damage. Finally, he contends that the aggregate sentence of thirty-five[3] years is greater than that deserved for these offenses. The State counters that the trial court properly considered the relevant factors and imposed a sentence consistent with the purposes and principles of the Sentencing act. Therefore, the State posits, the Defendant has not proven that the trial court abused its discretion.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence and the manner of service of that sentence. In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative

---

[3]The Defendant's brief states the "aggregate sentence of fifty-five years is greater than that deserved for the offenses committed . . . ." We assume this is a typographical error because he was, in fact, sentenced to an aggregate sentence of thirty-five years.

office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

In addition to these criteria, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *see also* T.C.A. §§ 40-35-102(1), -103(2); *In re Sneed*, 302 S.W.3d 825, 828-29 (Tenn. 2010). We review a trial court's decision to impose consecutive sentences for an abuse of discretion. *State v. James Allen Pollard*, ___ S.W.3d ___, No. M2011-00332-SC-R11-CD (Tenn. Dec. 20, 2013).

We find without merit the Defendant's contention that the trial court improperly applied enhancement factor (14), that the Defendant abused a position of private trust that significantly facilitated in the commission of the offense. We further reject the Defendant's contention that the trial court erred when it declined to apply other offered mitigating factors. The trial court considered the relevant principles and sentenced the Defendant to a within range sentence.

We now turn to address whether the trial court properly ordered partial consecutive sentencing. Regarding consecutive sentencing, a trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

T.C.A. § 40-35-115(b)(5) (2010). The trial court found that this section applied based upon the fact that this case involved multiple acts of sexual abuse including digital penetration and oral sex of the victim upon the Defendant, the Defendant's being the victim's mother's stepparent and acting as the victim's grandparent, and that the victim was in counseling for the abuse. We conclude that the trial court appropriately found that this factor applied to support it's ordering of partial consecutive sentencing.

We further conclude that the length of the Defendant's sentence is justly deserved in relation to the seriousness of these offenses, and is no greater than that deserved for the offenses committed. The trial court did not order that the sentences for all six convictions run consecutively, which would have totaled 105 years. It instead ordered that two of the six

sentences run consecutively, for a total of thirty-five years of incarceration. We conclude the trial court did not err by ordering partial consecutive sentencing. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the above mentioned reasoning and authorities, we affirm the trial court's judgments.

_____

ROBERT W. WEDEMEYER, JUDGE